**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **LATISHA NIXON-JONES,**<br><br>      *Plaintiff,*<br><br>**v.**<br><br>**THE CORPORATION OF MERCER UNIVERSITY,**<br><br>      *Defendant.* | **CIVIL ACTION NO.**<br>**5:24-cv-00064-TES** |

## ORDER GRANTING SUMMARY JUDGMENT

In this employment action, Plaintiff Latisha Nixon-Jones filed a three-count Complaint [Doc. 1] against The Corporation of Mercer University. First, relying on the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203(a), Plaintiff alleges that Mercer retaliated against her by creating a hostile work environment after she requested accommodations for a disability. [Doc. 1, ¶¶ 45–50]. Second, she claims that Mercer racially discriminated against her with respect to the terms and conditions of her employment in violation of 42 U.S.C. § 1981. [*Id.* at ¶¶ 51–56]. And third, Plaintiff contends that Mercer violated the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2615(a)(2), by retaliating against her after she took approved medical leave. [*Id.* at ¶¶ 57–63].

In her Response [Doc. 16] to Mercer's Motion for Summary Judgment [Doc. 13],

Plaintiff explicitly abandons her race discrimination claim under § 1981 "based on the development of the evidence during the discovery process." [Doc. 16-1, p. 9 n.2]. Thus, the Court **GRANTS** summary judgment to Mercer with respect to Plaintiff's § 1981 claim. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (citation omitted).

Mercer seeks summary judgment on the two remaining claims: Plaintiff's retaliatory hostile work environment claim under the ADA and her retaliation claim under the FMLA. *See* [Doc. 13]. Because there is no genuine dispute as to any material fact and Mercer is clearly entitled to judgment as a matter of law, the Court **GRANTS** Mercer's Motion for Summary Judgment [Doc. 13].

## BACKGROUND

The Court begins with the relevant factual background, viewed in the light most favorable to Plaintiff as the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.    Factual Background

Plaintiff joined the faculty of Mercer University School of Law in August 2021 as a tenure-track Assistant Professor. [Doc. 13-2, ¶ 1]. From the start, Plaintiff understood that Mercer preferred in-person teaching. [*Id.* at ¶ 3]; [Doc. 13-13, Nixon-Jones Depo., p. 121:6–9]. Plaintiff says she assumed that Mercer would follow the American Bar Association's recommendation to allow up to 50 percent of otherwise-in-person classes

to be taught remotely. [Doc. 13-13, Nixon-Jones Depo., 121:9–12]. Plaintiff testified that she raised this assumption with the law school's dean, Karen Sneddon, who made clear Mercer preferred in-person teaching, and no one at Mercer ever told Plaintiff otherwise. [*Id.* at 121:9–122:3].

When Plaintiff started teaching in Fall 2021, she taught Torts I. [Doc. 13-2, ¶ 37]. She contracted COVID-19 once before her first semester kicked off and again soon after she started teaching, and at some point she developed long-term complications affecting her heart, lungs, and mobility. [Doc. 1, ¶¶ 4, 9, 21].

### 1.    Fall 2021 Accommodation Request

Just a few weeks into her job, on August 26, 2021, Plaintiff requested a remote-work accommodation under the ADA for the remainder of the 2021–2022 academic year. [Doc. 13-2, ¶¶ 7–8]. She emailed Candace Whaley, Mercer's Associate Vice President of Human Resources, asking to "[t]each remotely during the Fall 2021 and Spring 2022 semesters during pericardial episodes" and to have "[a] stool or chair to sit in during in-person lectures." [Doc. 13-13, p. 84].

To support her request, Plaintiff sent Ms. Whaley a letter from Plaintiff's physician, Dr. Oliver Wendell Horne, IV. [*Id.* at p. 88]. That letter described Plaintiff's symptoms, noted the unpredictability of her condition, and stressed that during flare-ups, Plaintiff might be unable to work—in-person or otherwise:

> During a flare-up, [Plaintiff] experiences severe chest pain and shortness of breath which limits her activity and *will prevent her from performing her job*

3

> *duties*. . . . When experiencing these symptoms, [Plaintiff] will need to lay
> down [sic] and rest for the duration of her flare-up. She may even need to
> come in to [sic] the office for medication adjustment as well as examination.

[*Id.* (emphasis added)]; [Doc. 13-2, ¶ 9].

Ms. Whaley responded, stating that Mercer would provide a chair for Plaintiff to use while teaching in-person and observing that while Dr. Horne's letter might support a need for intermittent leave, it did not support Plaintiff's year-long remote-work accommodation request. [Doc. 13-13, p. 86].

Plaintiff replied to Ms. Whaley, stating that she was not yet eligible for FMLA leave and asserting that "[t]he letter states [she] cannot perform [her] duties (in-class teaching) during flares" so teaching remotely "would be the correct remedy" because it "would allow [her] to continue to work while [she is] in a flare." [*Id.* at p. 89]. Plaintiff provided no explanation for her interpretation of Dr. Horne's letter. *See* [*id.*].[1]

Ms. Whaley circled back with Plaintiff on October 1, 2021. [*Id.* at p. 89]. She reiterated that Dr. Horne's letter didn't support a remote-work accommodation and emphasized her "core concern": if flare-ups prevented Plaintiff from performing her job duties as Dr. Horne's letter stated, how would working remotely solve that problem? [*Id.*]. As for Plaintiff's concern that she was not yet eligible for FMLA leave, Ms. Whaley

---

[1] In her deposition, when asked about this exchange, Plaintiff explained that she believed Dr. Horne meant that she could perform her job duties remotely but not in person because "[t]here's nothing in [Dr. Horne's letter] that states that [she] wouldn't be able to teach remotely" and he knew she was working remotely at the time. [Doc. 13-13, Nixon-Jones Depo., p. 110:7–114:15].

explained that while Plaintiff was technically correct, Mercer had "a practice of granting some protected leave for those who have a qualifying event[] but are not yet eligible under the FMLA policy." [*Id.*]. Ms. Whaley faxed Dr. Horne a list of clarifying questions and attached a copy of those questions to her email to Plaintiff. [*Id.* at p. 90].[2] Dr. Horne, however, never responded. [*Id.* at p. 91].

Fortunately for Plaintiff, shortly after Dean Sneddon was appointed Interim Dean of Mercer Law on October 1, 2021, she intervened on Plaintiff's behalf. [*Id.*]; [Doc. 13-2, ¶ 2]. In a follow-up email on October 19, 2021, Ms. Whaley informed Plaintiff that Dean Sneddon had agreed to allow Plaintiff to work remotely for the remainder of the Fall 2021 semester. [Doc. 13-13, p. 91]; [Doc. 13-2, ¶ 10]. Ms. Whaley made clear that this was not a permanent accommodation, though, and Plaintiff would need to provide clearer medical documentation to support any future accommodation requests. [Doc.

---

[2] Ms. Whaley faxed Dr. Horne the following questions:

> 1. How will remote work enable [Plaintiff] to perform the essential functions of her job during flare-ups?
> 2. During a flare-up, the documentation states Latisha experiences "severe chest pain and shortness of breath which limits her activity and will prevent her from performing her job duties" and she "will need to lay down and rest for the duration of the flare-up."
> a. Does this include all job duties or are there only specific job duties she is unable to perform?
> b. If only specific duties, which job duties would she be unable to perform during a flare-up?
> 3. How often do flare-ups occur?
> 4. How long do the flare-ups generally last?
> 5. How long do you anticipate the flare-ups will continue to be an issue?

[Doc. 13-13, p. 90].

13-13, p. 91]; *see* [Doc. 13-2, ¶ 11].

And so, for the rest of the Fall 2021 semester, Plaintiff taught Torts I remotely, and Dean Sneddon supported her professionally by—for example—approving Plaintiff's request for reimbursement for a Legal Writing I workshop hosted by the University of Oregon School of Law. [Doc. 13-2, ¶¶ 10, 14]; [Doc. 16-1, p. 2].

Unfortunately, things apparently didn't go so smoothly from Plaintiff's students' perspective. Their feedback included complaints about insufficient office hours, canceled class meetings, lack of timely communication, lack of feedback, and typographical mistakes in course materials and on the final exam. [Doc. 13-2, ¶¶ 48, 52, 53]. Two students spoke up on Plaintiff's behalf, but even they acknowledged the factual basis for the complaints.[3]

---

[3] Plaintiff attempts to dispute Mercer's statement that "[o]ne or two students reached out to the Deans' office to offer their opinions that [Plaintiff's] negative student evaluations were due to implicit racial bias although the students acknowledged the truth of the complaints." [Doc. 13-2, ¶ 54]. She insists that neither student "acknowledged the truth of the complaints," but instead asserts that the complaints "were 'racially motivated,'" or "shaped by implicit 'bias.'" [Doc. 16-2, ¶ 54]. However, that assertion is flatly contradicted by the very evidence she cites. *See* [Doc. 13-12, pp. 52, 56]; [Doc. 13-2, ¶ 54].

One student who spoke up on Plaintiff's behalf conceded that there were "small typos or inconsistencies in [Plaintiff's] assignment instructions," "times where instructions [weren't] 100% clear," and formatting "issues in the instruction[s]" for an exam. [Doc. 13-12, p. 52]. The other, per Dean Sneddon's notes, acknowledged issues with Plaintiff's office hours policies, described Plaintiff as "not as organized as some professors," noted that Plaintiff "posted some materials that included typographical mistakes." [*Id.* at p. 56].

Although both students speculated that racial bias may have motivated some of the student evaluations—as Mercer correctly stated—they provided no factual basis for their opinions. [Doc. 13-12, pp. 52, 56]; *see* Fed. R. Evid. 602, 701, 702, 801. What is important is that both students acknowledge the substance of the complaints, supporting Mercer's statement, and because Plaintiff offers no contrary evidence, that fact is "deemed to have been admitted." LR 56, MDGa.

### 2.    Spring 2022 Accommodation Request

In a January 24, 2022, email to Ms. Whaley, Plaintiff requested to teach her Spring 2022 Legal Writing I and Disaster Law Seminar classes remotely "as a transition back to in-person teaching." [Doc. 13-13, p. 93]; [Doc. 13-2, ¶¶ 15, 37]. In support of her request, she provided a letter from a second doctor—Dr. Mary Bell Vaughn. *See* [Doc. 13-13, p. 94]. However, Dr. Vaughn's letter also failed to provide the information Ms. Whaley had requested. *See* [*id.* at pp. 92, 94].

Ms. Whaley responded the same day, reminding Plaintiff that her questions still needed answering. [*Id.* at p. 97]. In a back-and-forth email exchange, Plaintiff informed Ms. Whaley that she was no longer under Dr. Horne's care but that she submitted the form to her new doctor on January 25, 2022. [*Id.* at p. 96].

Dr. Vaughn faxed Ms. Whaley her answers (in bold font below) on January 28, 2022:

> 1. How will remote work enable Latisha to perform the essential functions of her job during flare-ups?
>
> **[Plaintiff] will be able to sit/lay down when flare ups occur.**
>
> 2. During a flare-up, the documentation states Latisha experiences "severe chest pain and shortness of breath which limits her activity and will prevent her from performing her job duties" and she "will need to lay down and rest for the duration of the flare-up."
>
> a. Does this include all job duties or are there only specific job duties she is unable to perform?
>
> **all job duties**

b. If only specific duties, which job duties would she be unable to perform during a flare-up?

3. How often do flare-ups occur?

**Undetermined**

4. How long do the flare-ups generally last?

**Undetermined**

5. How long do you anticipate the flare-ups will continue to be an issue?

**Undetermined**

[*Id.* at p. 100].

Perhaps the reason Dr. Vaughn's answers were so vague was that Dr. Vaughn had written the letter that Plaintiff submitted to Ms. Whaley and completed the questionnaire without even discussing Plaintiff's job duties with her. [Doc. 13-13, Nixon-Jones Depo., p. 128:17–25]. And that's Plaintiff's version of the story.

### 3. Mercer Denied Plaintiff's Remote-Teaching Request

At that point, based on the information Plaintiff provided, Ms. Whaley denied Plaintiff's request to teach remotely and advised her that she was expected to teach her

classes in person. [Doc. 13-2, ¶¶ 16, 17].[4] However, Mercer agreed to provide a chair in Plaintiff's classroom to enable her to teach in person, offered to work with Mercer Police to attempt to reserve a parking space for Plaintiff, and gave her the flexibility to use a "Change of Modality" to temporarily switch to online instruction whenever she felt ill. [*Id.* at ¶¶ 20–21, 23]; *see* [Doc. 13-14, p. 1]; [Doc. 16-1, pp. 2–3]. Ms. Whaley also reminded Plaintiff that she could take FMLA leave if her condition prevented her from working altogether. [Doc. 13-2, ¶ 22].

Plaintiff objected, once again providing her own interpretation of her doctor's opinions, and once again stating her opinion that she could teach class remotely during flare-ups. *See, e.g.*, [Doc. 13-14, p. 4–5]. She also objected that the accommodations Ms. Whaley offered did "not address the times when [her] doctor has stated that [she] cannot physically come into the building," but there is no evidence in the record that either of Plaintiff's doctors ever said that. [*Id.* at p. 5]. As Ms. Whaley put it, "the information [Plaintiff] shared [did] not correspond with the responses [her] doctor submitted on the questionnaire." [*Id.*].

To complete the déjà vu, on February 1, 2022, Plaintiff once again told Ms.

_____

[4] Mercer handled requests from other law professors in a similar manner. For example, Mercer approved one professor's remote-work accommodation for the Fall 2021 semester based on medical documentation stating that her health condition would not prevent her from fully performing her work duties remotely. [Doc. 13-2, ¶ 24]. Conversely, Mercer denied another professor's remote-teaching accommodation because the medical documentation from his doctor did not support remote work as a reasonable accommodation. [*Id.* at ¶ 25]. For the Spring 2022 semester, Mercer approved no remote-teaching accommodations for any faculty member, including Plaintiff. [*Id.* at ¶ 26].

Whaley that she was not yet eligible for FMLA leave: "As your letter states on October 1, 2021, I am ineligible for FMLA until I have been at Mercer for 12 months." [*Id.* at p. 5]. Just a couple months earlier, Ms. Whaley had explained that while Plaintiff was not technically eligible for FMLA leave, she *did* qualify for medical leave under Mercer's internal policies. [Doc. 13-13, p. 89]. This second go-around, Ms. Whaley reiterated that "the university does provide similar protected leave for qualifying events that would have been covered by the [FMLA]" and offered to discuss that process further. [Doc. 13-14, p. 3].

Ms. Whaley once again took the initiative and contacted Plaintiff's doctor, who was "unable to confirm" whether Plaintiff could perform her "job duties remotely or in person during flare-ups." [*Id.* at p. 8]. On February 18, 2022, Ms. Whaley finalized her decision and denied Plaintiff's remote-teaching request. [*Id.* at p. 9].

Meanwhile, Plaintiff's students continued to raise concerns. This time, students complained to the Associate Dean for Academic Affairs, Pamela Wilkins, that Plaintiff's Legal Writing I syllabus did not provide point values for assignments or mention the final exam. [Doc. 13-2, ¶ 59]. Plaintiff also scrambled multiple-choice questions on an exam—some of which were supposed to build on previous questions—causing confusion and leading some students to seek clarification. [*Id.* at ¶ 63]. At least two students reached out to the Dean's office to speculate that negative student evaluations were motivated by racial bias, but again, those students acknowledge that the

10

complaints were factually true. [*Id.* at ¶ 54].

Mercer Law's administrators, including Dean Sneddon and Dean Wilkins, relayed these complaints to Plaintiff during her performance evaluations. [*Id.* at ¶¶ 54, 72]. For example, in February 2022, Dean Sneddon conducted Plaintiff's first annual performance review, in which she raised concerns over negative Fall 2021 student evaluations. [*Id.* at ¶ 50].

### 4.    2022–2023 Academic Year

For the following academic year (2022–2023), Dean Sneddon assigned Plaintiff to teach upper-level courses—Legal Writing II, Torts Law Seminar, and Disaster Law Seminar—instead of Torts I. [*Id.* at ¶¶ 31–32]. According to Mercer, this change was motivated by institutional needs, Plaintiff's expressed interest in tort law, and student feedback regarding her Fall 2021 Torts I course. [*Id.* at ¶¶ 32–33].[5] Dean Sneddon

---

[5] Regarding Plaintiff's course reassignment from Torts I to upper-level courses, Mercer states that Dean Sneddon "made the decision to assign Plaintiff to Torts Law Seminar . . . based on Plaintiff's expertise and institutional needs," and "Dean Sneddon's plan was to allow Plaintiff to gain expertise, experience, and confidence, and assign her to Torts I, potentially in the next academic year." [Doc. 13-2, ¶ 33]. Mercer further states this decision was consistent with Dean Sneddon's role in assigning faculty members to teach courses "based on their experience and the needs of the law school," as Plaintiff's Fall 2022 course assignments reflected both "institutional needs" her "interest in Torts law." [*Id.* at ¶¶ 31–32].

Plaintiff disputes that "in part," pointing to her own deposition testimony, in which she testified that Dean Sneddon explained to her that Torts Law Seminar would be a better fit for Fall 2022, "based on the evaluations that [Dean Sneddon] had received and if [Plaintiff] were to have additional accommodations for the next year." [Doc. 16-2, ¶ 31]; [Doc. 13-13, Nixon-Jones Depo., p. 153:14–18]. Considering the evidence in the record, the Court finds this evidence to be "merely colorable" and not "significantly probative" of Dean Sneddon's motivation. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). But even if it were enough to show a dispute, Dean Sneddon's decision to shuffle Plaintiff's course load did not qualify as an adverse action, as explained below, so this dispute is immaterial.

testified that her plan was to give Plaintiff an opportunity to gain experience and confidence before assigning her back to Torts I. [*Id.* at ¶ 33].

Dean Wilkins even offered to allow Plaintiff to return to teaching Torts I in the Fall 2023 semester. [Doc. 13-15, p. 24]; [Doc. 13-2, ¶ 34]. But Plaintiff declined, stating that although her "ultimate goal [was] to return to a Torts or similar 1L or 2L class," teaching a four-credit-hour course "would be taxing and outside of [her] outer limit." [Doc. 13-15, p. 24].

Regardless, Plaintiff's teaching schedule was normal for a second-year tenure-track faculty member, and the change did not reduce her compensation, benefits, or otherwise alter the terms or conditions of her employment. [Doc. 13-2, ¶¶ 35–36]. To the contrary, Plaintiff received a 3% merit pay raise for 2022–2023. [*Id.* at ¶ 29]. She also sought and received a $9,900 summer research stipend. [*Id.* at ¶ 67]. And Mercer continuously supported her scholarship and professional development. For instance, Dean Sneddon approved Plaintiff's request to travel to the University of North Texas at Dallas to present her abstract on disaster law trends in February 2022, nominated Plaintiff to be a New Scholar at the March 2022 annual meeting of the Southeastern Association of Law Schools ("SEALS") and approved her travel request so she could attend the meeting, approved her request for reimbursement for travel to the FEMA Higher Education Symposium in May 2022, and asked Plaintiff to represent Mercer at the SEALS Steering Committee luncheon in August 2022. [*Id.* at ¶¶ 13, 58, 62, 65–66].

### 5.    Plaintiff's FMLA Leave

At the start of the Fall 2022 semester, Mercer approved Plaintiff's request for intermittent FMLA leave for lingering health issues. [*Id.* at ¶¶ 41–42].[6] Mercer never denied Plaintiff's requests for FMLA leave. [*Id.* at ¶ 45]. Yet, Plaintiff used only two of her 480 available hours of FMLA leave between October 2022 and February 2023, after which she reported no further FMLA leave. [*Id.* at ¶¶ 43–45]; *see* [Doc. 13-15, p. 23].

Plaintiff's students again complained to Dean Wilkins about last-minute class cancellations, most of which upper law school administration found out about only after the fact. [Doc. 13-2, ¶ 47]. Some of those canceled classes were never made up. [*Id.* at ¶¶ 47, 68]. Some students were also confused by Plaintiff's course materials, made worse by her lack of communication. [*Id.* at ¶ 68–69]. One student even complained directly to the university president that Plaintiff had missed classes, submitted pre-recorded lectures, and did not schedule make-up classes. [*Id.* at ¶ 70]. However, Dean Sneddon consistently supported Plaintiff, even filling in for her on short notice; for instance, on October 4, 2022, Dean Sneddon taught one of Plaintiff's courses. [*Id.* at ¶ 72].

---

[6] Despite Ms. Whaley's suggestions that Plaintiff consider FMLA leave and clarifying (twice) that Mercer had a practice of granting leave that would otherwise be secured by the FMLA to employees who are not yet technically eligible under the FMLA, Plaintiff later testified via deposition that she would have taken FMLA leave "[i]f that was an option," as it "would've provided what [she] needed during flares," but that she did not take it because she "was not eligible." [Doc. 13-13, Nixon-Jones Depo., p. 132:16–20].

### 6.    Plaintiff's Contract Renewal

The faculty voted in November 2022 to recommend renewing Plaintiff's contract for 2023–2024. [*Id.* at ¶ 74]. Dean Sneddon forwarded this recommendation to the provost and congratulated Plaintiff and other tenure-track professors via email and phone. [*Id.* at ¶¶ 75–76]. Under Mercer's policy, second-year faculty who are not renewed receive notice by December 15, and Plaintiff received no such notice. [*Id.* at ¶ 74].

In February 2023, Dean Sneddon conducted Plaintiff's second annual review. She informed Plaintiff that her rating had improved slightly, but that negative student comments persisted—including complaints about Plaintiff's absences, unclear expectations, and canceled classes. [*Id.* at ¶ 79]. Plaintiff claims that Dean Sneddon remarked that "final approval" of her contract renewal rested with the provost and university president, which Plaintiff interpreted as a warning that her job was in jeopardy if her absences continued. *See* [Doc. 16-1, p. 7]. Dean Sneddon's notes from that meeting reflect concerns about class cancelations but do not mention punishing Plaintiff for using FMLA leave. [Doc. 13-2, ¶ 79].

### 7.    Plaintiff's Resignation

On May 4, 2023, before the appointment letters for the 2023–2024 academic year had been issued, Plaintiff resigned effective June 2023. [Doc. 13-2, ¶¶ 85–86]. She emailed a resignation letter to Dean Sneddon, alleging a "toxic work environment"

rooted in "skepticism and hostility" about her medical absences:

> . . . [S]everal events over the last two years have made it clear that I can no longer continue to work in an unwelcoming and hostile environment.
>
> As you are aware, I requested accommodations for health issues that have arisen during my time at Mercer School of Law. Instead of receiving support, I have been met with skepticism and hostility from administration. This has created a toxic work environment that is not conducive to my health and wellbeing, and I feel that I have no choice but to resign.
> . . .
> [T]he current climate at the law school has made it clear that I can no longer continue in my role.
>
> I hope that the law school will take steps to address the underlying issues that have contributed to this hostile environment and that it will become a more welcoming and inclusive place for all members of its community.

[*Id.* at ¶ 85]; [Doc. 13-15, p. 25].

In other words, had Plaintiff not resigned, she would have received a faculty appointment for the 2023–2024 academic year. [Doc. 13-2, ¶ 87]. But, unbeknownst to anyone at Mercer, Plaintiff had already applied for and accepted a new job at Jacksonville University, having received a signed letter of intent on November 18, 2022, and a formal appointment letter on February 27, 2023. *See* [Doc. 19-1, pp. 37–38, 44].

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant].'" *United States v. Four*

*Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (citation omitted). "The moving party bears the initial responsibility of informing the . . . court of the basis for its motion." *Id.* at 1437.

As to issues for which the *movant* would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact[] and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the *non-movant* would bear the burden of proof at trial, the movant may either (1) point out an absence of evidence to support the non-movant's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)).

If the movant satisfies its initial burden, the burden then shifts to the non-movant, who must "go beyond the pleadings[] and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17). To satisfy its burden, the non-movant must present evidence that is more than "merely colorable" and is "'significantly probative' of a disputed fact." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 249–250).

16

In considering a motion for summary judgment, courts must accept the evidence presented by the non-movant as true and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, courts are not required to draw "all possible inferences" in favor of the non-movant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011). Where a party fails to address another party's factual assertion as required by Rule 56(c), the Court may consider the fact undisputed for the purposes of summary judgment. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001).

## DISCUSSION

The Court first considers whether "there is [a] genuine dispute as to any material fact" and then turns to whether Mercer "is entitled to judgment as a matter of law."

### A.    Local Rule 56

Under Local Rule 56, a party opposing summary judgment must respond to each fact set forth in the movant's statement of undisputed material facts *and* "attach to [its] response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried." LR 56, MDGa. Although Plaintiff complied with the first requirement by responding to each

fact set forth in Mercer's Statement of Undisputed Material Facts, *see* [Doc. 16-2], she failed to file her own separate statement of disputed material facts as required by Local Rule 56. *See* LR 56, MDGa. Instead, Plaintiff attached a "Statement of Additional Material Facts." *See* [Doc. 16-3]. Even a cursory review of that document reveals that the facts presented are not disputed. *See* [*id.*]. The Court declines to sift through the record on Plaintiff's behalf or reorganize the evidence in search of additional factual disputes. *See Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008); LR 56, MDGa.

Turning to Plaintiff's Response, Plaintiff largely admits the facts as stated in Defendant's Statement of Undisputed Material Facts. *See* [Doc. 16-2]; [Doc. 13-2]. She attempts to dispute the facts as stated in paragraphs 27, 29, 46–47, and 78, but because she does not "specifically controvert[]" them "by specific citation to particular parts of materials in the record," those facts "shall be deemed to have been admitted." [Doc. 16-2, ¶¶ 27, 29, 46–47, 78]; *see* LR 56, MDGa. For those reasons, and for the reasons explained elsewhere in this Order, the Court finds "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Next, the Court must decide whether Mercer, as the movant, is entitled to judgment as a matter of law on Plaintiff's remaining claims. *See id.*

### B.    Retaliatory Hostile Work Environment under the ADA

With the facts set forth, the Court turns to Count One of Plaintiff's Complaint, her Retaliatory Hostile Work Environment claim under the ADA. [Doc. 1, ¶¶ 45–50].

Mercer argues that, if such a cause of action exists, Plaintiff cannot show any of its three essential elements. [Doc. 13-1, Section IV.A.2.].

The Court is unconvinced that the ADA authorizes a retaliatory hostile work environment claim. *See* 42 U.S.C. § 12203(a). While the Eleventh Circuit has recognized an analogous claim under Title VII, *see Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012), it has never extended that reasoning to the ADA. And given the lack of a clear textual foundation in § 12203 for such a claim, the Court is skeptical that the statute goes that far. *See* 42 U.S.C. § 12203(a).

That said, the Court sees no obvious reason why *Gowski*'s framework couldn't, in theory, apply to the ADA. *Gowski* afforded only *Skidmore* deference to an agency's interpretation of Title VII, so its reasoning does not appear to be undermined by *Loper Bright*. *See Gowski*, 682 F.3d at 1312 (citation omitted) (applying *Skidmore* deference); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) (noting that *Skidmore* deference remains permissible post-*Chevron*). Mercer's argument that § 12203 does not support a retaliatory hostile work environment claim is therefore hardly a "sleight of hand." *See* [Doc. 16-1, p. 10]. It's a reasonable position grounded in the statutory text.

Still, the Court doesn't need to resolve that issue here. Giving Plaintiff the benefit of the doubt, the Court assumes—without deciding—that a retaliatory hostile work environment claim is cognizable under the ADA. *See* 42 U.S.C. § 12203(a).

Proceeding under that generous assumption, to prevail on a retaliatory hostile

work environment claim under the ADA, a plaintiff must ultimately prove that: (1) she engaged in a statutorily protected activity; (2) she was subjected to a hostile work environment; and (3) her protected activity was the but-for cause of the hostile work environment. *Bosarge v. Mobile Area Water & Sewer Svc.*, No. 20-14298, 2022 WL 203020, at *13 (11th Cir. Jan 24, 2022) (assuming that "a retaliatory hostile work environment claim is cognizable under the ADA, . . . the same standard applies to that claim as would apply to a similar claim under Title VII."); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (outlining the elements of an ADA retaliation claim); *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2021) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (explaining that for the purposes of a retaliatory hostile work environment claim, a plaintiff can show a hostile work environment with evidence that the alleged mistreatment "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination under Title VII").

In the absence of direct evidence, Plaintiff can establish her claim by circumstantial evidence either under the *McDonnell Douglas* burden-shifting framework or by demonstrating a "convincing mosaic" of circumstantial evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (outlining three steps: the plaintiff's "prima facie case," the defendant's legitimate non-discriminatory reasons, and the plaintiff's showing of pretext); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)

(noting that a plaintiff who cannot establish the elements of the *McDonnell Douglas* framework may still survive summary judgment by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer[] intentional discrimination by the decisionmaker"); *see also Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 947 (11th Cir. 2023) (noting that the convincing-mosaic approach "treats an employment discrimination suit" the same as "any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case.").

Because Mercer easily meets its burden of producing evidence of legitimate reasons for its actions, Plaintiff's "prima facie case [under the *McDonnell Douglas* framework] no longer has any work to do" and is "no longer relevant." *Tynes*, 88 F.4th at 945. So, the Court "jump[s] directly to the ultimate question of liability and decid[es] whether [Mercer] is entitled to judgment." *Id.* at 947.[7]

### 1.    Protected Activity

First, Plaintiff cannot show that her requests for accommodations constituted protected activity because they were not objectively reasonable. *See Stewart*, 117 F.3d at

---

[7] Courts in the Eleventh Circuit recognize "three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct: evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred; evidence of systematically better treatment of similarly situated employees; or evidence that the employer's justification for its action is pretextual." *Berry*, 84 F.4th at 1311 (citation omitted). However, "[w]hatever form the evidence takes, 'so long as [it] raises a reasonable inference' that the employer retaliated against the employee, 'summary judgment is improper.'" *Id.* (citation omitted).

1287 (citations omitted); 42 U.S.C. § 12203(a); *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). A request for accommodations under the ADA only qualifies as protected activity if the employee held "a good faith, objectively reasonable belief that [s]he was entitled to those accommodations under the ADA." *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1328 (11th Cir. 1998), *abrogated on other grounds by Burlington Northern*, 548 U.S. 53. This test has both a subjective and an objective component: a plaintiff must not only show that she subjectively (that is, in good faith) believed that she was entitled to the requested accommodation, but she must also show that the belief must was objectively reasonable in light of the facts and record. *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This is where Plaintiff's claim first encounters trouble.

Under the ADA, employers must offer "reasonable accommodations unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citation omitted). A reasonable accommodation is one that "enables the employee to perform the essential functions of the job," not one that eliminates those functions. *Id.* (citation omitted). Of course, the law does not require an employer to "accommodate an employee in any manner in which that employee desires," nor does it even require an employer "in every instance to provide employees the 'maximum accommodation or every conceivable accommodation possible.'" *Terrell v. USAir*, 132 F.3d 621, 626 (quoting *Stewart*, 117 F.3d at 1285).

"Moreover, the burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Stewart*, 117 F.3d at 1286 (citation omitted).

Viewing all of the evidence in the light most favorable to Plaintiff, the Court has serious doubts that any reasonable jury could find that Plaintiff had a good faith belief—based on the letters from her doctors—that she was entitled to work remotely. But even if she did believe that in good faith, her doctors consistently and unanimously opined that flare-ups would render her unable to work ***at all***, so her requests were not "objectively reasonable." *Standard*, 161 F.3d at 1328; *see, e.g.*, [Doc. 13-13, pp. 88, 94, 100]; [Doc. 13-14, p. 8].

Each time Mercer's HR representative pointed out this disconnect, Plaintiff doubled down, insisting—without any corroborating evidence—that her doctors meant to say that remote work would allow her to perform her duties. *See, e.g.*, [Doc. 13-13, p. 89]; [Doc. 13-14, pp. 3–4].[8] But a J.D. is not an M.D., and when pressed for clarification,

---

[8] For example, Plaintiff insisted that Dr. Horne really meant that she couldn't teach in-person during flare-ups, even though his letter said no such thing. [Doc. 13-13, p. 86]. She later testified that she believed Dr. Horne must have understood that she could teach remotely because she explained her job duties to him and "the whole time he had seen [her], [the job] was remote." [Doc. 13-13, Nixon-Jones Depo., p. 114:12–15]. Without weighing the evidence or making any credibility determinations, the Court notes that if Dr. Horne knew Plaintiff was teaching remotely already, and he still wrote that she couldn't perform her job at all during flare-ups, Plaintiff could not have reasonably believed that his letter supported her request.

Plaintiff's own physician confirmed that she meant what she said—Plaintiff's condition would prevent her from working during flare-ups, regardless of the setting. *See* [Doc. 13-13, p. 100]. That same pattern repeated in Spring 2022, despite Plaintiff's awareness that "clearer documentation regarding [her] health condition and needed accommodations" would be required. [Doc. 13-13, Nixon-Jones Depo., p. 118:17–119:1]; *see* [Doc. 13-13, pp. 94, 100].

On this record, only two conclusions are possible: either (1) Plaintiff, a law professor, failed to understand that her own doctors' letters undermined her request, or (2) Plaintiff repeatedly misrepresented what those letters actually said. Either way, no evidence in the record suggests that Plaintiff held a "a good faith, objectively reasonable belief that [s]he was entitled to" work remotely, so her requests do not qualify as protected activity. *Standard*, 161 F.3d at 1328.[9]

Plaintiff now argues that Mercer's decision to grant her a remote-work

---

[9] Mercer appears to argue that "[i]n-person teaching/instruction was an essential function of [Plaintiff's] job," [Doc. 19, p. 1 n.2], but the record contains evidence pointing in both directions. *See* [Doc. 13-4, Sneddon Decl., ¶ 10]; [Doc. 13-13, p. 89]; [Doc. 13-13, Nixon-Jones Depo., p. 58:17–22]. "Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires.'" *Lucas*, 257 F.3d at 1258 (citation omitted). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors," and "the employer's judgment as to whether a function is essential" is "[a]n important factor." *Geter v. Schneider Nat'l Carriers*, No. 22-11285, 2023 WL 7321610, at *9 (11th Cir. 2023) (citation omitted); *see D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (listing other relevant factors identified by the federal regulations).

While teaching is easily an essential function of a law professor's job, and Dr. Horne's letter said flare-ups might render Plaintiff unable to teach at all, [Doc. 13-13, p. 88], the Court is not prepared to find that in-person instruction was an "essential function" of Plaintiff's job. *See* [Doc. 13-1, p. 8]; *Lucas*, 257 F.3d at 1255. However, the Court's decision does not hinge on this distinction.

arrangement in Fall 2021 justified her belief that she was entitled to the same arrangement in Spring 2022. [Doc. 16-1, pp. 14–15]. But that argument fails both legally and factually. "Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so." *Lucas*, 257 F.3d at 1257 n.3; *see also Geter*, 2023 WL 7321610, at *6, *9 (holding that an employer's brief, pandemic-related telework arrangement did not transform in-person full-time work into nonessential functions). There's no evidence that Plaintiff's Fall 2021 remote-work arrangement was some sort of "trial run" for permanent remote teaching, nor does the record suggest that it went smoothly. Ultimately, even if Plaintiff genuinely believed that she was entitled to work remotely, that belief was not objectively unreasonable—and so her requests for accommodations do not qualify as protected activity under the ADA. *Standard*, 161 F.3d at 1328; *Lucas*, 257 F.3d at 1255 (citations omitted). This alone dooms her claim.

### 2. Adverse Action

Plaintiff also cannot show that Mercer took any materially adverse action against her because no reasonable jury could find that Mercer engaged in repeated conduct that might dissuade a reasonable worker from requesting ADA accommodations. *See Stewart*, 117 F.3d at 1287 (citations omitted).

Unlike typical retaliation claims, which are based on discrete acts, the "very nature" of a hostile work environment claim "involves repeated conduct." *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Hostile work environment claims are

based on the "cumulative effect of individual acts," each of which "may not be

actionable on its own." *Id.* Courts thus treat the "series of separate acts" comprising a

retaliatory hostile work environment claim as "one unlawful employment practice." *Id.*

at 103. A plaintiff can demonstrate a hostile work environment by showing, for

example, that "the workplace is permeated with discriminatory intimidation, ridicule,

and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see Miller v. Kenworth of

Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Here, the undisputed evidence shows that Plaintiff was never demoted, never

lost pay or benefits, never received a formal negative evaluation or reprimand, and

never terminated. On the contrary, she received a merit-based raise, received a $9,900

summer research stipend, and would have had her contract renewed if she had not

applied for and received a law professor position at Jacksonville University. [Doc. 13-2,

¶¶ 29, 74].

Plaintiff identifies several incidents and conditions which she argues created a

retaliatory hostile work environment: (1) Mercer's denial of her request to continue

teaching remotely in Spring 2022; (2) her reassignment from teaching Torts I to teaching

upper-level courses; (3) Mercer giving Plaintiff a smaller raise than it gave one of her

colleagues; (4) Plaintiff not being assigned to certain committees or boards in 2022; (5)

multiple comments from Dean Sneddon warning Plaintiff that her contract renewal or

future tenure prospects were in jeopardy due to her health-related absences and efforts to telework; and (6) what Plaintiff views as a general lack of support and eventual constructive discharge. [Doc. 16-1, p. 15].

The first order of business is to separate the wheat from the chaff. Several of these alleged incidents and conditions are not, in fact, evidence of an adverse action at all. For example, Plaintiff contends that Mercer retaliated against her for requesting an accommodation under the ADA . . . by denying that very accommodation. [Doc. 16-1, p. 15]. A denial of a requested accommodation cannot constitute retaliation for making the request—rather, it is simply a decision on the merits of the request, and the proper vehicle for challenging that decision is not a retaliation claim but a disability discrimination claim. *See Calvo v. Walgreens Corp.*, 340 F. App'x 618, 625–26 (11th Cir. 2009) (first citing *Stewart*, 117 F.3d at 1288 (refusing to address retaliation claims based on refusals to accommodate); and then citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 461 (2008) (Thomas, J., dissenting) (observing that discrimination is based on status, while retaliation is based on action)); [Doc. 13-1, p. 9 n.6]. Plaintiff did not plead a disability discrimination claim in this case, and she cannot shoehorn Mercer's refusal to extend her telework accommodation into a retaliation cause of action.

Plaintiff also asserts that she was "denied committee assignments." [Doc. 16-1, p. 4]; *see* [Doc. 13-13, Nixon-Jones Depo., p. 50:9–17]. Yet the record contains no evidence that Plaintiff was entitled to those roles or that her exclusion from them was even

unusual. To the contrary, the undisputed evidence shows that Mercer did place Plaintiff on committees, that Plaintiff "expressed that she was content with her committee assignments," and that Plaintiff even "indicated that she was a bit overwhelmed with committee work plus her other faculty responsibilities." [Doc. 13-2, ¶ 57]. The fact that she wasn't placed on one committee or another is irrelevant.

Similarly, Plaintiff attempts to repackage a salary increase as evidence of a "hostile environment." [Doc. 16-1, p. 4]. She notes that when she started teaching at Mercer, her salary was higher than that of another professor who started at the same time. [Doc. 13-13, Nixon-Jones Depo., p. 223:10–226:12]. However, Plaintiff's salary fell behind after she received a 3% raise compared to the other professor's 6% raise. [*Id.* at p. 223:10–226:12]; [Doc. 13-2, ¶ 29]. Plaintiff herself was uncertain about the basis for the difference, telling the other professor in a text message that she "wondered what [her raise] was based off of," and conceding in her deposition that she had no idea. [Doc. 13-15, p. 28]; [Doc. 13-13, Nixon-Jones Depo., p. 89:15-17]. Further, the undisputed evidence explains the discrepancy: the other professor took on more responsibility than Plaintiff by developing "a brand new clinic that required a lot of community development and development within the law school." [Doc. 13-2, ¶¶ 29–30]. The record is devoid of evidence supporting Plaintiff's claim that Mercer retaliated against her by raising her salary, and any after-the-fact dissatisfaction she might have had could not justify a jury finding in her favor. [Doc. 13-2, ¶¶ 29–30].

As for the course reassignment, Plaintiff contends that her reassignment from teaching Torts I in Fall 2021 to teaching upper-level courses in Fall 2022 harmed her career. However, adjusting an employee's schedule and duties—absent any loss of pay, loss of title, or something more—is not the type of action that would typically dissuade a reasonable employee from requesting ADA accommodations. *See Burlington Northern*, 548 U.S. at 68. The undisputed evidence shows that Plaintiff's 2022-23 teaching assignment was different but not inferior: she taught courses that were part of the curriculum and remained on the same tenure track with the same salary and benefits. [Doc. 13-2, ¶¶ 35–36]. In fact, Mercer claims that it made the reassignment to benefit Plaintiff and backs that up with evidence. [*Id.* at ¶¶ 32–33]. No course has higher prestige than another, according to Dean Sneddon's unrebutted testimony, and Mercer's tenure standards do not disadvantage those who teach skills courses. [Doc. 13-4, Sneddon Decl., ¶ 30].

Plaintiff hangs her hat on her self-serving deposition testimony "that it was her perception . . . that the loss of a core subject matter lecture course was detrimental to her." [Doc. 16-1, p. 19]. However, she admitted that she was unaware of any negative impact on her employment and offers no evidence that teaching upper-level courses was materially worse than teaching Torts I such that her reassignment would dissuade a reasonable worker from taking FMLA leave. [*Id.* at pp. 5, 18]; [Doc. 13-13, Nixon-Jones Depo., pp. 155:6–156:23]; [Doc. 16-2, ¶ 35].

Thus, the evidence in the record does not establish a triable issue as to whether this routine managerial decision could have deterred an employee of ordinary resolve from requesting ADA accommodations. *See Burlington Northern*, 548 U.S. at 68.

Turning to Plaintiff's more central allegations, she throws a handful of Dean Sneddon's statements and actions at the proverbial wall—for example, requiring Plaintiff to teach in person, warning her about attendance issues, and discussing the contract renewal process in a manner Plaintiff found threatening. [Doc. 16-1, p. 15, 19–20]. None of it sticks. Plaintiff points to perhaps three or four distinct conversations over the span of a year in which she felt singled out or chastised. *See,* [*id.*]. While Plaintiff claims that these were not trivial to her, this frequency of incidents is remarkably low. The events Plaintiff complains of were not daily, weekly, or even monthly. Instead, they were intermittent, separated by several months, and even if they were higher in frequency, they simply wouldn't have dissuaded a reasonable employee from requesting ADA accommodations. *Buckley v. Sec'y of Army*, 97 F.4th 784, 799 (11th Cir. 2024).

Also, Dean Sneddon's supposed threats and warnings of termination didn't amount to a materially adverse action. In the Eleventh Circuit, a threat of termination—unaccompanied by any actual termination or other tangible harm—isn't a materially adverse action for the purposes of a retaliation claim. *See, e.g., Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 149 (11th Cir. 2021) (citing *Burlington Northern*, 548 U.S. at

68).[10] Here, Dean Sneddon's alleged statements were never accompanied by any actual negative personnel action—they were, at most, cautionary remarks. *Id.* There is no evidence in the record that Dean Sneddon ever acted on any purported threat, and a reasonable professor in Plaintiff's position would not be dissuaded from requesting ADA accommodations merely because a supervisor emphasized the importance of meeting job expectations and explained the contract renewal process.

Viewing all of the evidence in the light most favorable to Plaintiff, and considering all of the facts of this case, Mercer's alleged actions—individually or considered together—do not rise to the level that would permit a jury to find that they "might well have dissuaded" a reasonable employee from requesting ADA accommodations. *See Burlington Northern*, 548 U.S. at 68. This too is fatal to her claim.

### 3. Causation

Finally, the Court briefly addresses causation: Even assuming that Plaintiff

---

[10] Plaintiff argues that that "in a more recent opinion," *Moore v. City of Homewood*, "the court of appeals explicitly described a warning of disciplinary action as dissuasion from engaging in the protected activity of taking medical leave." No. 21-11378, 2023 WL 129423, at *12 (11th Cir. 2023). Did it though? In that case, the Eleventh Circuit found it "plausible that a reasonable employee may be dissuaded from [engaging in protected activity] if she knew that, in the immediate aftermath, her employer would threaten disciplinary action, impose a burdensome schedule, demand longer hours, *and* subject her to various physical examinations." *Id.* (emphasis added); *see also Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 863 (11th Cir. 2020) (quoting *Burlington Northern*, 548 U.S. at 70–72) ("[S]tatements from a supervisor—which threatened both termination and possible physical harm—'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"). Here, Plaintiff offers no evidence that she "knew" that after she made her accommodation request that she would "immediately" be threatened with termination or any disciplinary action—which she wasn't. The Court easily finds *Moore* distinguishable from this case.

produced evidence showing that her requests were protected activity and that she

suffered a hostile work environment, Plaintiff's retaliation claim would still fail because

she cannot demonstrate that her requests for accommodation were the but-for cause of

the hostile work environment.[11]

    Plaintiff must ultimately "prove that had she not engaged in the protected

conduct," she would not have been subjected to a hostile work environment. *Gogel v.*

*Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (cleaned up); *see, e.g.,*

*Jones v. City of Birmingham*, No. 24-10363, 2024 WL 4276182, at *3 (11th Cir. Sept. 24,

2024). This is a more stringent standard, and on this record no reasonable jury could

find for Plaintiff.

    Temporal proximity between the protected act and the adverse event can suggest

causation, but only if the timing is "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S.

268, 273 (2001). A delay of even a few months between the protected activity and the

employer's action generally negates any inference of causation, absent some other

evidence. But temporal proximity is just one tool to prove causation. *See Highsmith v.*

*CSX Transportation, Inc.*, No. 5:22-cv-52, 2024 WL 3164660, at *6 (S.D. Ga. June 24, 2024).

In the absence of temporal proximity, a plaintiff may offer "additional evidence to

demonstrate a causal connection, such as a pattern of antagonism or that the adverse

---

[11] The parties agree that Plaintiff "must ultimately prove that the protected activity was 'a but-for cause' of the adverse action." *Jones*, 2024 WL 4276182, at *3 (quoting *Nassar*, 570 U.S. at 362).

action was the first opportunity for the employer to retaliate." *Jones v. Suburban Propane, Inc.*, 577 F. App'x 951, 954–55 (11th Cir. 2017) (citations omitted).

Here, Plaintiff concedes that she cannot show causation through temporal proximity. [Doc. 16-1, p. 19]. Instead, she contends that "there are triable issues of intent as to each action she challenges." [*Id.* at pp. 20–21].

This argument lacks evidentiary support. For example, the undisputed evidence shows that Mercer graciously granted Plaintiff a semester-long remote-work arrangement in Fall 2021 even though Plaintiff's doctors' notes did not support the arrangement. [Doc. 13-2 ¶ 10]. Ms. Whaley told Plaintiff that if she wished to continue teaching remotely the following semester, more specific documentation would be required. [*Id.* at ¶¶ 14–18]. Plaintiff failed to provide the requested documentation, and Whaley denied Plaintiff's remote-teaching request for Spring 2022 for that reason. [*Id.* at ¶ 16]; *see* [Doc. 13-3, ¶¶ 4, 19, 20, 23]. Even so, Mercer allowed Plaintiff to use short-notice remote sessions or take leave if necessary. [Doc. 13-2, ¶ 21]; [Doc. 13-3, ¶¶ 20–21, 23]. Plaintiff's argument—that because she "successfully performed her teaching load remotely," a jury could disregard the voluminous, unrebutted evidence showing exactly why Mercer denied her request—is unsupported by the law or the record, as explained above. [Doc. 16-1, p. 20].

Viewing all of the evidence in the light most favorable to Plaintiff, and considering all the facts of this case, the scant evidence on which Plaintiff relies is no

more than merely colorable, and as such it is insufficient to show any genuine dispute as to any fact material to her claim. *See James*, 823 F. App'x at 735. Mercer has articulated its legitimate, non-discriminatory reasons for each action, and Plaintiff has failed to demonstrate that Mercer's proffered reasons were "merely a pretext to mask [retaliatory] actions." *Gogel*, 967 F.3d at 1135. No reasonable jury could find in Plaintiff's favor on any element of her retaliatory hostile work environment claim, and Mercer is entitled to summary judgment in its favor.

## C.    **FMLA Retaliation**

Finally, the Court turns to Count III–Plaintiff's FMLA Retaliation claim. [Doc. 1, ¶¶ 60–61]. Mercer challenges Plaintiff's prima facie case under the *McDonnell Douglas* burden-shifting framework. See [Doc. 13-1, p. 21].

Under that framework, Plaintiff must first establish a prima facie case through proof that "(1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is some causal relation between the two events." *Lapham*, 88 F.4th at 889 (cleaned up).[12]

Plaintiff used a total of two hours of FMLA leave from October 2022 to February

---

[12] Although the term "prima facie" typically "'describe[s] the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue,' within the *McDonnell Douglas* framework the term . . . has a different meaning." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 945 (11th Cir. 2023). The difference in this context is somewhat subtle: it only requires a plaintiff to show a "causal link"—that is, that "the protected activity and the negative employment action are not completely unrelated"—even though a plaintiff must ultimately prove but-for causation. *Curet*, 2024 WL 2564166, at *3 (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

2023. [Doc. 13-2, ¶ 43]. The record contains no evidence that Mercer ever denied a request for such leave, and Plaintiff concedes she was allowed to miss class when necessary, albeit with the expectation she keep the administration informed. [*Id.* at ¶ 45]; [Doc. 16-1, at 4–5].

Mercer doesn't dispute that Plaintiff's two hours of FMLA leave in February 2023 constituted protected activity, but it argues that no reasonable jury could find for Plaintiff on the other two elements. See [Doc. 13-1, pp. 21–23]; [Doc. 19, pp. 8–10]. The Court agrees.

### 1.    Adverse Action

Like Plaintiff's ADA claim, her FMLA retaliation claim fails for want of adverse action. While the Eleventh Circuit has not resolved whether *Burlington Northern*'s "dissuade a reasonable worker" standard governs FMLA retaliation claims, the Court assumes that it does.[13]

Plaintiff bases her entire claim on two alleged statements and omissions by Dean Sneddon. First, Plaintiff claims that "in the February 2023 evaluation conference, [Dean] Sneddon made a critical reference to Plaintiff's recent FMLA usage and informed [her]

---

[13] In its Motion, Mercer argues for a more onerous standard: "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *See* [Doc. 13-1, pp. 21–22]. In her Response, Plaintiff argues for *Burlington Northern*'s more lenient "well might have dissuaded" standard. [Doc. 16-1, p. 24]. And in its Reply, Mercer argues under the *Burlington Northern* standard. [Doc. 19, p. 9]. For the purposes of this Motion, the Court assumes that the relaxed *Burlington Northern* standard governs FMLA retaliation claims.

that more missed work time could threaten the renewal of her contract." [Doc. 16-1, p. 25]. Second, Plaintiff claims that Dean Sneddon "fail[ed] to advise" Plaintiff that she signed off on renewing Plaintiff's contract and that the deadline to notify Plaintiff that her contract would not be renewed had passed. [*Id.*].

To support her first claim, Plaintiff once again relies on her own deposition testimony:

> A     . . . Overall [the review] was positive. [Dean Sneddon] did make mention of the fact that I had to go onto FMLA again and that I had to teach remotely at the beginning of the semester, and then we dove into the fact that I had not received a signed contract for the next year.
>
> Q     And what do you remember she mentioned about the FMLA?
>
> A     Basically what I just stated, that she said I had started the FMLA again and that because I had been in person is why we were seeing the positive reviews and that if I continued to have absences or call out that it could turn back to being a negative review.

[Doc. 13-13, Nixon-Jones Depo., p. 16:9–20]. To make heads or tails of this testimony, the Court backs up a few pages and observes that Plaintiff was recalling the content of some emails from Dean Sneddon which apparently contained data relevant to her February 2023 annual review. *See* [*Id.* at pp. 13:25–14:21].

But, taking Plaintiff's own testimony at face value, and viewing it in the light most favorable to Plaintiff's claim, nothing about it is "critical" of Plaintiff's "recent FMLA usage," and it says nothing about Dean Sneddon "inform[ing] [Plaintiff] that more missed work time could threaten the renewal of her contract." *See* [Doc. 16-1, p.

25]. If it shows anything, it shows that Dean Sneddon offered Plaintiff insight into why her student evaluations might fluctuate, so it fails to support Plaintiff's claim.[14]

In support of her second claim—that Dean Sneddon "fail[ed] to advise" Plaintiff that she signed off on renewing Plaintiff's contract—Plaintiff does not cite to the record at all. [Doc. 16-1, p. 25]. And, having reviewed all the evidence Plaintiff cited throughout her brief, the Court finds none to support this argument.[15] Plaintiff has produced no evidence that Dean Sneddon owed her a duty to reveal her recommendation to the provost and president, and all of the timelines Dean Sneddon allegedly withheld from Plaintiff were contained in the Faculty Handbook. *See* [Doc. 13-10, p. 129]. More fundamentally, Plaintiff does not explain how she was harmed by not being told about the recommendation, especially given that she had already applied for, received, and accepted a position at Jacksonville University without saying a word about it to Mercer. *See* [Doc. 19-1, pp. 37–38, 44]. The hypocrisy on this point is simply

---

[14] Even if it could be viewed as a threat as Plaintiff claims, without more, it would not dissuade a reasonable employee from taking FMLA leave. *See Williams-Evans*, 843 F. App'x at 149.

[15] For example, in her deposition, Plaintiff testified that in her February 2023 annual review, Dean Sneddon told her that "even if [Plaintiff's] contract were renewed, if future medical issues or flare-ups caused her to begin missing work again, 'future decisions could be affected.'" [Doc. 16-2, p. 7 (citing [Doc. 13-13, Nixon-Jones Depo., p. 164:10–16)]]. She also cites her testimony that Dean Sneddon "did not mention that she had recommended renewal of [Plaintiff's] contract and suggested it was still under review by the Provost and President." [*Id.* (citing [Doc. 13-13, Nixon-Jones Depo., p. 183:9–24)]]. Finally, she cites Dean Sneddon's notes from Plaintiff's February 2023 annual review, which "state that [Dean Sneddon] voiced 'concern given the number of personal issues occurring' regarding [Plaintiff] and that she 'raise[d] issues of the contract extension discussion as relates to the course evaluations and direct classroom observations.'" [*Id.* (citing [Doc. 13-12, p. 66)]].

stunning.

On this record, no reasonable jury could find that Dean Sneddon's alleged actions would have dissuaded a reasonable worker from taking FMLA leave. *See Burlington Northern*, 548 U.S. at 68. Thus, Plaintiff cannot establish the second element of a prima facie case of FMLA retaliation. *See Lapham v. Walgreen Co.*, 88 F.4th 879, 889 (11th Cir. 2023).

### 2.    Causation

Finally, even if Plaintiff could establish an adverse action, she cannot show that it was caused by her FMLA leave. Plaintiff only took two hours of FMLA leave on one day in February 2023, and she did not submit this leave time until nearly two months after the fact. [Doc. 13-2, ¶¶ 43–44].

At most, the evidence shows that Dean Sneddon followed up on student complaints from Fall 2021. [*Id.* at ¶¶ 68–70]; [Doc. 16-1 at pp. 7, 25]. Those complaints could not have had anything to do with Plaintiff's FMLA usage, because they predated it. While Plaintiff may have perceived Dean Sneddon's cautionary remarks as "threats," the record indicates that any references to a possible negative review merely addressed unscheduled class cancellations—untethered to the small fraction of her absences that were connected to her FMLA usage. [Doc. 13-2 ¶¶ 43, 79].

Because Plaintiff fails to show any adverse action and cannot tie her second-year scrutiny to her minimal FMLA usage, she cannot establish a prima facie case of FMLA

retaliation, and the burden of production does not shift to Mercer. *See Lapham*, 88 F.4th at 889. Furthermore, her "failure to establish a prima facie case is fatal" in this particular case because it "reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination." *Tynes*, 88 F.4th at 947. Thus, Mercer is entitled to judgment on this claim.

<u>CONCLUSION</u>

Accordingly, because Plaintiff has explicitly abandoned her § 1981 race discrimination claim, and because no reasonable jury could conclude that Mercer retaliated against Plaintiff either for requesting ADA accommodations or for exercising her rights under the FMLA, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 13].

**SO ORDERED**, this 18th day of June, 2025.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**